UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :     No. 4:CR-02-085-02
                             :
     vs.                     :     (Judge Muir)
                             :
MICHAEL ALLEN MORGRET,       :

OPINION

MUIR, District Judge

I.   Introduction.

This case originated on April 11, 2002, with the filing of a six-count indictment charging Defendants Michael Allen Morgret (hereinafter Morgret"), Roger Gordon Schmidt, James Russell Crossley, and Mandy Jo Bennett Duck with various offenses.  On April 29, 2002, John D. Felix, Esquire, was appointed to represent Morgret.

On May 23, 2002, a superseding indictment was filed.  In addition to the Defendants named in the original indictment, Morgret's brother, Robert Morgret, was added as a Defendant in that document.  A second superceding indictment containing 19 counts was filed on November 14, 2002.

On August 1, 2003, a plea agreement relating to Morgret was filed.  On August 25, 2003, Morgret pled guilty to counts 1 and 6 in the second superseding indictment.  Those charges are: 1) conspiracy to possess with the intent to distribute, and the distribution of, in excess of 50 grams of crack cocaine and 5 kilograms of cocaine and hydrocodone, in violation of 21 U.S.C. §

846; and 2) conspiracy to intimidate witnesses, illegal possession and distribution of firearms, arson, and mail fraud, in violation of 18 U.S.C. § 371.  A  lengthy statement of facts and reasons in support of the guilty plea consisting of 9 typed, double-spaced pages was also filed on August 25, 2003.  An amended statement of the same length was filed later that day.

On December 5, 2003, we received Morgret's pre-sentence report.  United States Probation Officer Eric W. Noll determined Morgret's Total Offense Level to be 36, his Criminal History Category to be VI, and his advisory Guideline Imprisonment Range to be 324 to 405 months.  Morgret disputed various facts asserted in the pre-sentence report and he filed objections thereto.

On December 10, 2003, we held a pre-sentence conference in this case.  At that point we learned that Morgret wished to file a motion to withdraw his guilty plea and to discharge Attorney Felix.  On December 19, 2003, Attorney Felix filed on Morgret's behalf a motion to withdraw Morgret's guilty plea.  On December 23, 2003, Attorney Felix filed a motion to withdraw his appearance, which we granted by order dated December 30, 2003.

Between December 31, 2003, and March 5, 2004, three different attorneys were appointed to represent Morgret.  The final counsel appointed was Douglas B. Chester, who was appointed on March 5, 2005, and remains Morgret's counsel.

The substitutions of counsel for Morgret prompted us to extend the deadline for the brief in support of his motion to withdraw guilty plea.  On June 17, 2004, we issued an order in which we allowed Morgret until June 23, 2004, to file a brief in support of the motion to withdraw his guilty plea, or a separate motion to withdraw the motion to withdraw his guilty plea.

Morgret sought and obtained an extension of the deadline in our order of June 17, 2004.  On June 24, 2004, we extended Morgret's deadline to July 28, 2005.  Also on June 24, 2004, the United States Supreme Court issued its decision in Blakely v. Washington, ___ U.S. ___, 124 S. Ct. 2531 (2004).

On August 3, 2004, Morgret filed an untimely motion to withdraw his motion to withdraw his guilty plea.  We accepted the motion as timely filed and by order dated August 9, 2004, we allowed Morgret to withdraw his motion to withdraw his guilty plea.  In that order we also scheduled a second pre-sentence conference for September 23, 2004.

On September 16, 2004, Morgret filed 1) additional objections to his pre-sentence report, and 2) a motion to continue the second pre-sentence conference.  On September 20, 2004, we granted the motion and continued the second pre-sentence conference to October 28, 2004.

The pre-sentence conference was held on October 28, 2004, and on October 29, 2004, we issued an order in which we set a

3

deadline of November 19, 2004, for Morgret to file a brief in support of his objections to the pre-sentence report, or a stipulation addressing all of the factual disputes relating to those objections.  Morgret filed a number of motions to extend the November 19, 2004, deadline and we granted all of those motions, which in effect extended the November 19, 2004, deadline to February 16, 2005.

On January 12, 2005, the United States Supreme Court issued its decision in the case of <u>United States v. Booker</u>, ___ U.S. ___, 2005 WL 50108 (2005).  On February 3, 2005, Morgret filed a document entitled "Defendant's Post-Booker Fanfan Objections to Pre-sentence Report."  That document encompasses all of Morgret's pending objections to his pre-sentence report.  On February 16, 2005, Morgret filed a motion for an extension of time to file a brief in support of his objections.  By order dated February 16, 2005, we granted motion.  On March 10, 2005, Morgret filed his brief.  On March 25, 2005, the government timely filed its opposition brief.  No reply brief was filed.

The parties were unable to reach any stipulation with respect to the material disputed facts.  On April 29, 2005, Morgret filed a motion to exclude certain dates for the hearing on his objections to the pre-sentence report.  By order dated April 29, 2005, we granted that motion and placed this case on

our June, 2005, Trial List for a hearing on Morgret's objections to his pre-sentence report.

On May 14, 2005, Morgret filed a "Motion to Impanel Jury," and a supporting brief.  On June 2, 2005, the government filed an opposition brief.  No reply brief was filed and on June 24 2005, we issued an order denying the motion to impanel a jury.  In that order we also scheduled the hearing for July 22, 2005.

The hearing commenced as scheduled and at the conclusion of the proceedings on that date we set August 19, 2005, as the next date for the hearing because of government counsel's unavailability until that date.  On August 17, 2005, government counsel filed an unopposed motion to continue the hearing.  On August 18, 2005, we granted that motion and set September 16, 2005, as the next date for the hearing.  The hearing was held and concluded on September 16, 2005.  During the hearing Morgret made an oral motion for the court to apply the "beyond a reasonable doubt" evidentiary standard to his objections to the pre-sentence report.  After the conclusion of the hearing, on September 16, 2005, we issued an order in which we 1) required the parties to file annotated proposed findings of fact and conclusions of law by September 26, 2005, and 2) allowed Morgret until September 26, 2005, to file a brief in support of his oral motion concerning the burden of proof to be applied to his objections to the pre-sentence report.

The government filed its annotated proposed findings of fact and conclusions of law on September 23, 2005.  On September 29, 2005, after being granted an extension of time in which to do so, Morgret timely filed his annotated proposed findings of fact and conclusions of law, and his brief regarding the applicability of the "beyond a reasonable doubt" standard of proof to his objections.  The government filed its opposition brief on October 4, 2005.  The time allowed for Morgret to file his reply expired on October 24, 2005, and no such brief has been filed.  Morgret's objections to his pre-sentence report and his motion to apply the "beyond a reasonable doubt" standard are ripe for disposition.

The following are the Court's findings of fact, discussion, and conclusions of law.  Findings of fact which are not disputed are noted with a "U" in parenthesis after each such finding or conclusion.  Findings of fact which are not disputed but are objected to as being irrelevant are noted with a "U/O" in parenthesis after each such finding.[1]

## II. Findings of Fact

1.  Beginning in or about June of 2001 Michael Allen Morgret, Roger Gordon Schmidt, James Russell Crossley, Mandy Jo Bennett Duck, Eric Rupert, and Brian Andrus conspired to distribute crack cocaine and cocaine.

---

1.  We overrule the objections to the undisputed findings of fact used herein to which there have been objections.

2.  The conspiracy existed from June of 2001 through April of 2002.

3.  In October of 2001, Roger Schmidt was dissatisfied with his existing sources of cocaine, and was seeking a new source for cocaine.  (U)

4.  In October of 2001, Michael Morgret was introduced to Roger Schmidt through a mutual acquaintance, Shawn Poorman.  (U)

5.  Eric Rupert was a friend of Michael Morgret, having known him for more than ten years.  (U)

6.  Rupert had been introduced to Schmidt by someone other than Morgret as a potential source for cocaine.  (U)

7.  Schmidt met with Morgret to see if Morgret and Rupert could obtain cocaine for Schmidt at a lower price than what Schmidt had been paying for it.  (U)

8.  Up until October or November of 2001, Morgret had used a source of cocaine in Philadelphia.

9.  At some point prior to October of 2001, Morgret got into a dispute with that source and was no longer able to use it.

10. In October of 2001 Rupert knew of a source in New York City, "Frankie and Jose," in Washington Heights, where relatively pure cocaine could be purchased for approximately $1,000.00 per ounce.  (U)

11. The cocaine source in New York City was Rupert's source, and not Morgret's.

12. Prior to his introduction to Rupert's source, Morgret did not have a "source" of his own in New York City. (U)

13. Morgret and Schmidt were interested in using Rupert's New York source to purchase cocaine in connection with the conspiracy.

14. In November of 2001 Schmidt, Morgret, and Rupert took a trip to New York City to purchase cocaine and they bought approximately an ounce of cocaine from Rupert's source in the Washington Heights area of New York City.

15. On that trip Schmidt provided all of the money for the purchase.

16. The cocaine purchased on that trip was consumed by Schmidt, Morgret, and Rupert upon their return to Renovo.

17. Two or three weeks later, towards the end of November or the beginning of December, 2001, Rupert, Morgret, and Andrus made another trip to purchase cocaine from Rupert's source in New York City. (U)

18. Approximately 1.5 ounces of cocaine was purchased on Rupert's second trip.

19. On both the first and second trips, powdered cocaine (cocaine hydrochloride) and not cocaine base (cocaine hydroxide) was purchased.  (U)

20. On Rupert's third trip to New York City he purchased between 2 and 2.5 ounces of cocaine in connection with the conspiracy.

21. The most cocaine ever purchased on a trip involving Rupert was between 5 and 6 ounces of cocaine.

22. Rupert's trips to New York City to buy cocaine occurred at intervals of about two weeks.

23. Rupert personally participated in "six or seven" trips to purchase cocaine in New York City.  (U)

24. Morgret went along on all of the trips to New York City in which Rupert was a participant.

25. Schmidt went along on approximately three trips to New York City with Morgret and Rupert.  (U)

26. The average amount of cocaine purchased on each trip which included Rupert was between 1.5 and 2.5 ounces.

27. Rupert was not aware of every trip to New York City made by all of the co-conspirators to purchase cocaine.

28. Morgret made trips to New York City to purchase cocaine without Rupert.

29. In January of 2002, Rupert had a falling out with Schmidt, when Rupert consumed 17 or 18 grams of cocaine

that Schmidt, not Morgret, had given to him to sell.
(U)

30. Eric Rupert traveled with Morgret to New York City and Philadelphia where they obtained a total at least 500 grams but less than 2 kilograms of cocaine.

31. Eric Rupert admitted in his plea agreement and under oath at his guilty plea that he conspired with Morgret to distribute and possess with intent to distribute at least 500 grams but less than 2 kilograms of cocaine.
(U)

32. Co-conspirator James Crossley traveled with Morgret on a regular basis to New York City for the purpose of obtaining cocaine.

33. Between October of 2001 and March of 2002 Crossley made seven or eight trips to New York City to purchase cocaine.

34. Crossley received baggies of cocaine powder from Schmidt and Morgret for Crossley to distribute to other people.

35. Co-conspirator Mandy Jo Bennett Duck also accompanied Morgret on these trips.   (U)

36. Other individuals also accompanied Morgret on the drug buying trips.   (U)

37.  Morgret requested Andrus to travel to New York City to
     purchase cocaine.

38.  Andrus traveled to New York City on approximately 12
     occasions to obtain cocaine and on each occasion the
     co-conspirators obtained at least 6 ounces of cocaine
     for a total of approximately 72 ounces of cocaine.

39.  The most cocaine purchased on a trip involving Andrus
     was eight or nine ounces.

40.  Morgret and Schmidt jointly gave Andrus cocaine to sell
     for Morgret and Schmidt.

41.  Andrus sold some of that cocaine.

42.  Morgret once gave Andrus cocaine to sell so that Andrus
     would have money to pay a fine.

43.  Morgret and Schmidt expected Andrus to sell other
     cocaine and return the proceeds from the sales to
     Morgret and Schmidt.

44.  In late December of 2001 or early January of 2002,
     Andrus stole approximately 2 ounces of cocaine from
     Morgret and Schmidt.

45.  Morgret took weekly trips to New York City for cocaine
     and supplied Schmidt with as much as four ounces of
     cocaine following these trips.

46.  Morgret did not go on all of the trips to New York City
     to purchase cocaine.

47.  Before making his weekly trip to New York City for
     cocaine, Morgret met with Schmidt.

48.  Between October of 2001 and March of 2002 one or two
     trips per week were made in furtherance of the
     conspiracy to purchase cocaine in New York City.

49.  An average of 4 ounces of cocaine was purchased on each
     trip.

50.  To further the goals of the conspiracy, Schmidt
     provided the majority of the money and Morgret, through
     Rupert, secured the source of cocaine.

51.  Morgret and Schmidt agreed that Morgret would take
     trips to New York City, where Morgret purchased cocaine
     and crack cocaine with money supplied by Schmidt and
     others, and Morgret would transport the drugs to Renovo
     and Lock Haven, Pennsylvania, where some of it was cut
     up and packaged for distribution.

52.  As the trips to New York City became routine, the
     conspirators took orders from various people to
     purchase cocaine for them in New York City.

53.  After a number of trips to New York City had been made
     to purchase cocaine, Morgret and Schmidt became
     partners with Morgret selling cocaine to people in Lock
     Haven, Pennsylvania, and Schmidt selling cocaine to
     people in Renovo, Pennsylvania.

54. The conspirators collected money for the cocaine purchases from various people.

55. When cocaine was purchased in New York City, a group of people gathered, most often at the hotel bar in Renovo belonging to Schmidt but sometime at a private residence, and over the ensuing days and nights they consumed a portion of the cocaine which had been purchased.

56. Some of those parties continued for several days at a time.

57. The portion which was not consumed was sold to fund the group's next bulk cocaine purchase.

58. The conspirators purchased crack cocaine in New York City at least twice; once they purchased an ounce and once they purchased 52.7 grams, which was approximately 4 grams less than 2 ounces.

59. After trips to New York City, powdered cocaine (cocaine hydrochloride) was cooked into crack cocaine (cocaine hydroxide) by a variety of individuals at the bar in Renovo and elsewhere.  These individuals included Schmidt, Rupert, Morgret, and others.  (U)

60. The crack cocaine so produced was usually immediately consumed by some of those present at the parties.

13

61.  On a few rare occasions, a small piece of the crack
     cocaine cooked by the conspirators was sold.

62.  Only those who sold cocaine in furtherance of the
     conspiracy were allowed to consume the crack cocaine
     for free.

63.  The crack cocaine cooked at the parties was produced in
     teaspoons or tablespoons.

64.  If the party was at Schmidt's bar, the bar was closed
     to the public and most of those present consumed
     cocaine powder, or crack cocaine, or both.

65.  On the trips to New York City, there were three or four
     people in the car, and each would receive cocaine
     powder as payment for having participated in the trip.

66.  Numerous people contributed to the fund used to
     purchase cocaine in New York City.

67.  Schmidt provided the majority of the money to purchase
     cocaine on the trips to New York City.

68.  Morgret contributed between $200 and $400 to the
     purchase "kitty" when he had funds available.

69.  Other individuals, including Rupert and Andrus, also
     contributed to the purchase "kitty" when they had funds
     available.

70. Morgret used Andrus to collect money from people who owed money for cocaine that had been purchased. Morgret referred to Andrus as his "collector."

71. Morgret assigned Crossley the responsibility of physically possessing the drugs on the return trip from New York City.  Morgret referred to Crossley as his "holder."

72. Schmidt provided the vehicles used on most of the trips to New York City, either by making his own personal vehicle available, or by providing a credit card so that a rental vehicle could be obtained.

73. Morgret's personal vehicle was used on some of these trips.

74. Morgret also rented vehicles using Schmidt's credit card to make trips for the purpose of obtaining cocaine.  (U)

75. Although Schmidt accompanied Morgret on approximately three cocaine buying trips to New York, with the most recent occurring in March of 2002, Morgret mainly traveled to New York without Schmidt.  (U)

76. Schmidt gave Morgret a total of between $30,000.00 and $70,000.00 to fund the purchase of cocaine.

77. Schmidt also allowed Morgret to use Schmidt's truck to make the trips.

78. A .38 caliber pistol was concealed in a compartment of Schmidt's truck.

79. Schmidt told Morgret about the location of that firearm in the truck.

80. Morgret carried a 9 mm handgun during the existence of the conspiracy.

81. Morgret handled the .38 caliber handgun at Schmidt's bar and Duck's residence.

82. On one occasion Schmidt wrote $4,000 checks to Morgret and co-conspirator James Crossley to fund the purchase of cocaine. (U)

83. With that $8,000.00 Morgret purchased 8 ounces of cocaine and almost 2 ounces of crack cocaine on a single trip to New York City.

84. Schmidt provided cocaine to individuals who sold cocaine to users of that substance, and compensated the sellers based on the quantity sold, with either cash or a corresponding amount of drugs. (U)

85. The goal of Schmidt and Morgret was to pay for the cocaine and crack which they personally consumed by selling a portion of the drugs brought back from New York City.

86. After his arrest on state drug charges in March of 2002, Schmidt attempted to hide from the Pennsylvania

State Police the firearms identified in Count Five of
the Superseding Indictment, which he had kept at his
residence in Phillipsburg, Pennsylvania.

87. Schmidt arranged for Michael Morgret to retrieve the
guns.  (U/O)

88. Michael Morgret requested his brother, Robert Morgret
[sic] to keep the guns at Robert's residence in
Flemington, Pennsylvania.  (U/O)

89. On April 15, 2002, investigators executed a search
warrant at Robert Morgret's residence and recovered the
five (5) firearms identified in the indictment.  (U)

90. In November 2001, Schmidt discussed with Michael
Morgret and Brian Andrus that he could obtain
approximately $140,000 in insurance proceeds if his
hotel bar, Sutliff's Hotel at 157 Eight Street in
Renovo, Pennsylvania, caught on fire.  (U/O)

91. Schmidt, Michael Morgret and Brian Andrus talked about
how the insurance proceeds from a fire at the hotel
could be used to fund the purchase of six or seven
kilograms of cocaine.  (U/O)

92. Schmidt, Michael Morgret and Andrus discussed obtaining
bulk quantities of cocaine with the insurance proceeds,
selling the cocaine bought with the insurance proceeds,
and then splitting up the proceeds of the cocaine

sales, with Schmidt receiving an amount equaling his initial investment in the hotel.  (U/O)

93.  During the discussion, Schmidt, Michael Morgret and Brian Andrus agreed that the conspirators would set the fire at the hotel on a slow evening so that no one would get hurt, and selected Christmas Eve as the time for the fire.  (U/O)

94.  Schmidt told Michael Morgret and Brian Andrus not to use a car that anyone would recognize.  (U)

95.  On December 24, 2001, one of the conspirators obtained the use of a vehicle and an empty milk jug from a female friend.  (U)

96.  Michael Morgret and Andrus used gasoline to set the hotel on fire.  (U/O)

97.  On March 7, 2002, co-conspirator Mandy Jo [Bennett] Duck traveled with Michael Morgret and co-conspirator James Russell Crossley to New York where they obtained approximately 44 grams of cocaine powder and 18 grams of crack cocaine.  (U)

98.  Morgret, Duck, and Crossley then transported those substances back to Pennsylvania, where they met the undercover agent in the Wegman's parking lot.  (U)

99.  At that location, Morgret delivered to the undercover agent approximately 11 grams of crack cocaine and 17

grams of cocaine powder, and a search of the vehicle
recovered the remaining drugs.

100. Morgret's co-conspirator Roger Gordon Schmidt
stipulated under oath for purposes of his sentencing
that he was responsible for the distribution of 2.5
kilograms of cocaine (500 kilograms marijuana
equivalent) and 125 grams of cocaine base (1000
kilograms to 2500 kilograms marijuana equivalent).  (U)

101. Morgret's co-conspirators Mandy Jo Bennett Duck and
James Russell Crossley stipulated under oath for
purposes of sentencing that they were responsible for
conspiring to distribute approximately 60.2 grams of
cocaine powder and approximately 18 grams of crack
cocaine.  (U)

III.  Discussion.

As a threshold matter we address Morgret's motion to apply
the "beyond a reasonable doubt" standard to his objections to the
pre-sentence report.  The motion is based exclusively on
Morgret's interpretation of the initial majority opinion issued
in the case of United States v. Booker, ___ U.S. ___, 125 S. Ct.
738 (2005), written by Justice Stevens.

As noted by the government at the conclusion of Morgret's
pre-sentence hearing, in presenting this motion Morgret requests
us to revisit ground that we have already covered in this case.

19

In ruling on Morgret's motion to apply the "beyond a reasonable doubt standard, we incorporate and rely upon the reasoning and conclusions set forth in our order of June 24, 2004, in which we denied his motion to impanel a jury for Morgret's pre-sentence hearing.

In both that prior motion and his pending motion concerning the burden of proof, the flaw in Morgret's position is that it takes into account only one of the two majority opinions issued by the United States Supreme Court in <u>Booker</u>.  Morgret does not consider the second majority opinion issued in that case, written by Justice Breyer.

Whereas the scope of Justice Stevens's opinion (cited by Morgret) is limited to the conclusion that a constitutional violation had occurred under the mandatory sentencing guideline scheme, Justice Breyer's opinion sets forth the remedy to cure that violation.  In that second majority opinion, the court in <u>Booker</u> excised the provisions of the guidelines which made them mandatory.  Morgret's position appears to be based on his view that the constitutional violation discussed in Justice Stevens's opinion remains despite the issuance of Justice Breyer's opinion.

As we stated in our order of June 24, 2005,

> [w]hen both opinions are applied in a given case, we are of
> the view that no constitutional right held by a defendant is
> violated if a court makes findings of fact based on a
> preponderance of the evidence in order to apply advisory
> sentencing guidelines. *See* Booker, 125 S. Ct. at 766-767
> (other than the specific provisions of the guidelines cited

and excised by the court, all remaining provisions of the
guidelines remain in effect); U.S.S.G. § 6A1.3 Commentary
(providing that the court may resolve factual disputes based
on a preponderance of the evidence standard).

Order of June 24, 2005, pp. 2-3)  For those same reasons we will
deny Morgret's motion to apply the "beyond a reasonable doubt"
standard to the objections to his pre-sentence report.

Before delving into the merits of Morgret's objections to
his pre-sentence report, we will briefly review the facts relied
upon by the government and Probation Officer to establish the
advisory guideline imprisonment range set forth in Morgret's pre-
sentence report.

The quantity of drugs attributed to Morgret by the
government and Probation Officer is at least 2.5 kilograms of
cocaine powder and at least 50 grams of cocaine base (or crack
cocaine), which establishes a Base Offense Level of 32.  The
Total Offense Level of 36 was determined by applying a two-level
upward adjustment for possessing a firearm in connection with the
offense, and a similar adjustment for obstruction of justice.
Although Morgret has entered a guilty plea to counts 1 and 6 of
the second superseding indictment, no downward adjustment for
acceptance of responsibility has been applied because of the
relevant conduct which Morgret has denied.

Morgret's twelve prior convictions result in a Criminal
History Score of 15.  The Probation Officer added two points
because the instant federal offenses occurred less than two years

21

after his release from imprisonment.  The total of 17 Criminal
History Points results in Morgret's placement in Criminal History
Category VI.  The resulting advisory Guideline Imprisonment Range
is 27 years to 33 years and 9 months.

The paragraphs of the pre-sentence report to which Morgret
objects are 8 through 27, 29, 30, 33, 34, 36, 39, 40, 41, 44, 59,
65, 77, 78, 94, and 95.[2]

To a large extent Morgret's objections to paragraphs 8
through 27, 29, 30, 34, 39, 40, 41, 77, 78, 94 and 95 overlap and
may be discussed jointly.  The primary argument underlying
Morgret's common objection to those paragraphs, which is the only
argument developed to any appreciable extent in Morgret's brief
supporting his objections, is that

> [i]nasmuch as [the] facts [set forth in those paragraphs]
> were not specifically contained in a written stipulation
> executed by Mr. Morgret and Counsel, not admitted on the
> record by Mr. Morgret at the Change of Plea, and were not
> proven beyond a reasonable doubt at trial, under the holding
> in *Blakely*, and under the Stevens majority Opinion on
> *Booker/Fanfan*, they cannot appear in the Pre-Sentence
> Report.

(Brief in Support of Post-Booker/Fanfan Objections to Pre-
sentence Report, p. 6)  Morgret contends that our reliance upon
any disputed fact in the pre-sentence report

---

2.  Although Morgret initially objected to other portions of his
pre-sentence report, those other objections have been withdrawn.
*(See* Morgret's Brief in Support of Post-Booker/Fanfan Objections
to Pre-sentence Report, p. 5)

would necessitate the sort of judicial fact-finding
specifically prohibited by the Stevens majority opinion in
*Booker/Fanfan*, and would result in an increase in the
Defendant's sentence beyond the statutory maximum based upon
the quantity of drugs actually admitted to.

(Brief in Support of Post-Booker/Fanfan Objections to Pre-
sentence Report, pp. 6-7)

In essence this argument is a challenge to our authority
independently to make any finding of fact which is applied to
enhance Morgret's sentencing exposure under the advisory
guidelines.  For the reasons stated in our order of June 24,
2005, which are quoted above in discussing Morgret's motion
concerning the applicable burden of proof, we are of the view
that our authority to make findings of fact in determining a
defendant's advisory guideline imprisonment range survives the
United States Supreme Court's holdings in <u>Booker</u>.  Morgret's
blanket objection to our authority to make such findings, based
on a preponderance of the evidence, is overruled.

The conclusions set forth above compel us to apply and rely
upon the facts set forth in the pre-sentence support which have
been proven by a preponderance of the evidence at Morgret's pre-
sentence hearing.

We will address Morgret's remaining specific objections in
their order of significance, from greatest to least.  The most
important facts relate to the quantity of drugs attributable to
Morgret.  These facts essentially relate to paragraph 40 of the

23

pre-sentence report, which states that Morgret's current advisory guideline imprisonment range is based on his involvement with at least 2.5 kilograms of cocaine powder and at least 50 grams of cocaine base (or crack cocaine).

Morgret's initial argument concerning the quantity of drugs attributable to him is that, as a matter of law, he can not be held responsible for each and every ounce of cocaine powder and crack cocaine purchased by any of the co-conspirators.  He contends that the substantial quantities of drugs used by the co-conspirators themselves, or given to their friends at parties, are irrelevant to determining the amount of drugs for which he is responsible.

Our consideration of this issue beings with the observation that Morgret has pled guilty to conspiracy to possess with the intent to distribute, and the distribution of, crack cocaine and powder cocaine.  The Court of Appeals for the Third Circuit has held that "a sentence in a criminal conspiracy is based upon all relevant conduct and not merely offense conduct." United States v. Boone, 279 F.3d 163, 177 (3d Cir. 2002).  In reaching that conclusion, the court in Boone adopted the following reasoning of the United States Court of Appeals for the First Circuit:

> [a defendant] convicted of conspiring to distribute
> controlled substances, ... is responsible for all "drugs [he
> or she] personally handled or anticipated handling, and,
> under the relevant conduct rubric, for drugs involved in
> additional acts that were reasonably foreseeable by [him or
> her] and were committed in furtherance of the conspiracy."

24

Id. (quoting United States v. Rivera-Maldonado, 194 F.3d 224, 228 (1st Cir.1999).

The advisory United States Sentencing Guidelines further provide that

> Relevant Conduct for a drug trafficking conviction includes not only all controlled substances involved "during the commission of the offense of conviction," but also those substances involved as "part of the same course of conduct or common scheme or plan as the offense of conviction."

United States v. Boone, 279 F.3d 163, 178 (3d Cir. 2002)(quoting U.S.S.G. § 1B1.1(a)(2)).

Based on the cited authority, we are of the view that the quantity of drugs for which Morgret is responsible includes all of the drugs purchased and sold, or otherwise distributed, by any co-conspirator in furtherance of the conspiracy.  The evidentiary record in this case clearly establishes that the goals of the conspiracy were to purchase bulk quantities of cocaine (and a small quantity of crack cocaine) in New York City and sell enough cocaine to fund the co-conspirators' personal drug habits.  The conspirators also cooked and distributed additional crack cocaine during their parties.

Specifically with respect to powder cocaine, the illegal activity at issue here is the purchase of cocaine in New York City from one group of people and transporting it to Pennsylvania for consumption by another group of people.  We are of the view that the use of a portion of the cocaine by the conspirators

themselves, and by their friends free of charge, is of no moment.
All of the drug-trafficking in this case was part of the same
course of conduct or common scheme and therefore should be
included in the drug quantity attributable to Morgret.

With that legal standard in mind, we turn to the facts of
this case, beginning with the facts to which Morgret has
admitted.  Morgret concedes that his drug trafficking was part of
the conspiracy described in the indictment.  On the first page of
the nine-page "Amended Statement of Facts and Reasons in Support
of the Guilty Plea," filed on August 25, 2003, Morgret
specifically acknowledges Schmidt as a "co-conspirator."  Those
concessions allow us to attribute to Morgret the same quantities
for which Schmidt has accepted responsibility.

In connection with his guilty plea, Schmidt stipulated under
oath that he was responsible for the distribution of 2.5
kilograms of cocaine and 125 grams of cocaine base.  Morgret has
admitted that he was involved in the same drug conspiracy as
Schmidt.  Schmidt's stipulation, in conjunction with Morgret's
admission, provides one basis to overrule Morgret's objections
relating to the quantity of drugs attributable to Morgret.
However, the admission and stipulation are not the only basis in
the record to overrule those objections.

The evidence presented at Morgret's pre-sentence hearing
supports the government's representations concerning the quantity

of powder cocaine and crack cocaine to be considered in
sentencing Morgret.  Before recounting the details of that
evidence, we note that this conspiracy involved Michael Allen
Morgret, Roger Gordon Schmidt, James Crossley, Mandy Jo Bennett
Duck, Robert E. Morgret, Jr., Eric Rupert, and Brian Andrus.
Michael Allen Morgret and Schmidt were the organizers and leaders
of the conspiracy; only those two knew the full extent of the
conspiracy, including the frequency of the trips to New York City
to purchase drugs and the amounts purchased.

Only Crossley, Andrus, Rupert, and Schmidt testified at
Morgret's pre-sentence hearing.  Because of their limited
knowledge of the conspiracy, the cumulative testimony of
Crossley, Andrus, Rupert presents an incomplete picture of the
conspiracy's full scope.  Schmidt's testimony is especially
significant because he was the only witness at the pre-sentence
hearing who possessed a full understanding of the conspiracy's
goals.

The evidence of record demonstrates that the conspirators
pooled their money to purchase cocaine powder in bulk quantities
in order to purchase the drug at a discounted price.  During the
conspiracy (from late October of 2001 to March of 2002) co-
conspirators traveled once or twice each week to New York City to
purchase cocaine.  The conspirators' collective appetite for
cocaine powder was strong enough that they began producing crack

27

cocaine.  In an effort to satisfy and fund their own drug habits, the conspirators sold a portion of the cocaine powder brought back from New York City to individuals who were not co-conspirators.

Specifically with respect to cocaine powder, the evidence introduced at the pre-sentence hearing regarding the number of trips taken by members of the conspiracy and the amounts purchased between October of 2001 and March of 2002 supports the government's assertion that the conspiracy distributed at least 2.5 kilograms, or 88.184905 ounces, of cocaine powder.[3]  Eric Rupert purchased at least 4.5 ounces on his first three trips to New York City.  Brian Andrus made at least 12 trips and on each of them purchased at least 6 ounces of cocaine.  On one occasion Andrus purchased at least 8 ounces.  Multiplying 11 trips by 6 ounces, and adding 8 ounces for the twelfth trip results in approximately 74 ounces being purchased on trips involving Andrus.  Crossley purchased an additional 6 ounces on trips which did not include Rupert or Andrus.

Because we have used the lowest figures stated by each witness, that is the very least amount attributable to Morgret while Andrus was still participating in the conspiracy.  Andrus's involvement ended right after Christmas of 2001 because he stole

---

3.  For the purposes of converting grams to ounces, we consider one ounce to equal 28.349523 grams.

cocaine from Morgret and Schmidt.  At that point the conspiracy
was responsible for 4.5 ounces from the first three trips taken
by Rupert, 74 ounces purchased by Andrus, and the 6 ounces
purchased by Crossley may be added to that, resulting in at least
84.5 ounces.

There is no indication in the record that the conspiracy
lost any momentum when Andrus and the conspirators parted
company.

To the 84.5 ounce figure may also be added the quantities
sold to the undercover agent in February (16.2 grams) and March
(44 grams) of 2002.  While that precise total may not meet the
threshold of 88.184905 ounces, it is significant to note that
many trips by the conspirators to New York City to obtain drugs
are not reflected in our calculation.  Based on the totality of
the evidence presented to us, and considering the frequency of
the trips taken and the quantities purchased in furtherance of
the conspiracy, we find that a total of at least 88.184976 ounces
of cocaine was purchased and distributed by Morgret and his co-
conspirators in furtherance of the conspiracy.

The amount of crack cocaine (at least 50 grams) which the
government seeks to ascribe to Morgret in this case has also been
proven.  Schmidt testified that on one trip to New York Morgret
purchased an amount of crack cocaine which was only four grams
short of two ounces.  That amount, in and of itself, is

29

sufficient to meet the government's threshold.  Nonetheless,
there is evidence that crack was purchased in New York City on at
least one other occasion.  We may also consider the crack cooked
in Schmidt's bar, some of which was sold.

All of Morgret's objections relating to the quantity of
drugs attributable to him are overruled.  The Probation Officer
properly determined the Base Offense Level to be 32 in paragraph
40 of the pre-sentence report.

The next objection to consider is that pertaining to
paragraph 41 of the pre-sentence report in which a two-level
upward adjustment is applied pursuant to United States Sentencing
Guideline §§ 2D1.1(b)(1) and 3D1.2(c) because a firearm was
possessed in connection with the offense.  At some point during
the conspiracy Brian Andrus learned that Schmidt kept a gun (a
.38 caliber pistol) in the truck which was often driven to
purchase cocaine in New York City.  Schmidt told Morgret about
the location of that weapon, although Schmidt was not sure that
it was ever in the truck when Morgret used it to go to New York
City to purchase cocaine.  However, Morgret was a passenger in
the truck on many occasions when it was used for that purpose.

Even if the instances concerning the truck are completely
disregarded, the evidence demonstrates that Morgret handled the
weapon at Schmidt's bar and Duck's residence.  Morgret also
carried a 9 mm handgun during the existence of the conspiracy.

The testimony of Andrus and Schmidt at the pre-sentence hearing concerning the locations and times in which those guns had been handled by Morgret establishes by a preponderance of the evidence that Morgret possessed a firearm in connection with the drug conspiracy.  The Probation Officer properly adjusted Morgret's sentence upwards by two levels pursuant to U.S.S.G. §§ 2D1.1(b)(1) and 3D1.2(c) in paragraph 41 of the pre-sentence report.  We will overrule Morgret's objection to that paragraph.

The next objection to consider is that to paragraph 44 in which the Probation Officer adjusted Morgret's offense level upwards by two levels for obstruction of justice pursuant to U.S.S.G. §§ 3C1.1 and 3D1.2(c).  The Probation Officer references paragraphs 18, 29, and 32 of the pre-sentence report in support of that adjustment.

Paragraph 32 is the first paragraph under the heading "Adjustment for Obstruction of Justice."  That paragraph states the following:

> Michael Morgret willfully attempted to obstruct or impede the administration of justice during the course of the prosecution of the instant offenses of conviction, and the obstructive conduct related to the defendant's offenses of conviction.  After his arrest by state authorities on March 9, 2002, Roger Schmidt had Michael Morgret and Robert Morgret remove firearms from his home before the Pennsylvania State Police executed a search warrant.  Thus, the defendant concealed evidence that was material to an official investigation (see paragraph 18).  Pursuant to U.S.S.G. § 3C1.1, Application Note 4(d), a two level enhancement is applicable when the defendant destroys or conceals or directs or procures another person to destroy or conceal evidence that is material to an official

investigation or judicial proceeding ... or attempts to do
so.

(Pre-sentence Report, p. 11, ¶32)  Although Morgret initially
objected to that paragraph, he has withdrawn that objection.[4]
Because paragraph 18 is incorporated into paragraph 32, Morgret's
withdrawal of his objection to paragraph 32 is tantamount to a
withdrawal of the objection to paragraph 18 as well.  Morgret
expressly admits the material facts in those paragraphs on page 5
of his "Amended Statement of Facts and Reasons in Support of the
Guilty Plea," which was filed on August 25, 2003.

The admitted facts relating to paragraphs 18 and 32 of the
pre-sentence report justify the two-level upward adjustment
imposed by the Probation Officer in paragraph 44.  Consequently,
there is no need to consider the accuracy of the assertions in
the third paragraph referenced in 44, which is paragraph 29
(dealing with Morgret's alleged threatening of a witness).  The
upward adjustment for obstruction of justice is proper regardless
of the accuracy of the representations in paragraph 29.  We need
not resolve disputes which are immaterial to a defendant's
sentencing.  *See* Fed.R.Crim.P. 32(i)(3)(B) (court may determine
that a ruling on a dispute is unnecessary because the matter will
not affect sentencing).  Based strictly on the accuracy of the

---

4.  In his most recent objections Morgret states that "[t]he
Defendant's Objection to the allegations contained in Paragraph
32 of the Pre-Sentence Report is withdrawn." (Defendant's Post-
Booker/Fanfan Objections to Pre-sentence Report, p. 6)

information in paragraphs 18 and 32 of the pre-sentence report,
Morgret's objection to paragraph 44 of the report is overruled.

Morgret's next objection relates to paragraphs 33, 34, and
59 of the pre-sentence report, in which the Probation Officer
"denies him any reduction in [the] Base Offense Level for
Acceptance of Responsibility." (Defendant's Post-Booker/Fanfan
Objections to Pre-sentence Report, p. 8)  Morgret contends that
he is entitled to the downward adjustment for acceptance of
responsibility because he "did enter a timely plea." (Id.)

The Probation Officer concluded that Morgret does not
qualify for any reduction for acceptance of responsibility
because 1) Morgret has denied very significant facts relating to
the instant offenses, and 2) Morgret has obstructed justice. *See*
Pre-sentence report, p. 11, ¶34 (citing U.S.S.G. § 3E1.1,
Application Note 4, which provides that conduct which supports an
obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1
ordinarily indicates that the defendant has not accepted
responsibility for his criminal conduct).

Morgret appears to base this objection primarily upon his
view of the holding in Booker.  On page 6 of his objections,
Morgret argues that

> [t]he Supreme Court's holding in *Booker/Fanfan* leads to the
> conclusion that mere denial of relevant conduct, for which
> judicial fact-finding is no longer allowed, cannot be used
> to enhance the Defendant's Base Offense Level beyond what it
> would be if the facts were to be admitted.

(Defendant's Post-Booker/Fanfan Objections to Pre-sentence Report, p. 6)

There are two reasons to overrule Morgret's objections to paragraphs 33, 34, and 59.  The first is that those objections are based on Morgret's flawed reading of <u>Booker</u>, which we rejected in the earlier portions of this opinion.  The second reason to overrule these objections is that the Probation Officer correctly noted that a defendant's obstruction of justice indicates that he has not accepted responsibility.  Morgret has obstructed justice in this case and is therefore not entitled to any downward adjustment for acceptance of responsibility.  Morgret's objections to paragraphs 33, 34, and 59 are overruled.

The next objections to consider are to paragraphs 65 and 78, concerning the computation of Morgret's Criminal History Score and Category.  In paragraph 65 the Probation Officer assigned Morgret three Criminal History Points for committing the offenses of unsworn falsifications and retail theft on November 30, 1984. In paragraph 78 the Probation Officer added two Criminal History Points "because the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under U.S.S.G. § 4A1.1(a) ...." (Pre-sentence Report, p. 19, ¶78)

We first address Morgret's objection to paragraph 78.  Once again Morgret relies upon his reading of <u>Booker</u> to support this objection.  Morgret contends that

> [a]lthough the *Booker/Fanfan* decisions specifically except the fact of previous convictions, it was not admitted during the Change of Plea hearing that Mr. Morgret was still on probation when involved in the instant crime.  Pursuant to the holdings in *Booker/Fanfan*, it would require judicial fact-finding to make this determination, and this sort of fact finding is no longer permitted.

(Defendant's Post-Booker/Fanfan Objections to Pre-sentence Report, p. 8)  Based on our prior conclusion that we possess the authority to make such findings of fact, we overrule Morgret's objection to paragraph 78.

We further note that Morgret has not raised any factual error concerning the date of any offense set forth in the pre-sentence report.  The unchallenged information of record clearly supports the two points added by the Probation Officer in paragraph 78 of the pre-sentence report.

With respect to paragraph 65, Morgret argues that the assignment of the three points in that paragraph is erroneous because the offenses at issue occurred "outside the 15 years [sic] limitation for counting old offenses." (Defendant's Post-Booker/Fanfan Objections to Pre-sentence Report, p. 8)

As noted above, the Probation Officer assigned 17 Criminal History Points to Morgret.  A defendant with 13 or more Criminal History Points is placed in Criminal History Category IV.

(Chapter VI, Part A) If we sustained Morgret's objection to paragraph 65 he would retain 14 Criminal History Points and would still be put in Criminal History Category IV.  Consequently, any ruling on this objection will have no bearing on Morgret's Criminal History Category determination.

We will exercise our authority set forth in Federal Rule of Criminal Procedure 32 and elect not to rely upon the contents of paragraph 65 in sentencing Morgret.  As a result, we need not rule on his objection to that paragraph. Fed.R.Crim.P. 32(i)(3)(B)(court may determine that a ruling on a dispute is unnecessary because the matter will not affect sentencing).

The next objection to consider is that to paragraph 94, which states that "[t]he guideline imprisonment range is 324 to 405 months."  Morgret's objection to that paragraph is based on the other, specific objections set forth above, which we have denied.  For the reasons set forth above, we will overrule his objection to paragraph 94.

The penultimate objection to consider is to paragraph 95, which states that "[t]he plea agreement has no impact on the computation of the sentencing guidelines."  Morgret's objection is that

> [p]ursuant to the holdings in *Booker/Fanfan*, it is the position of the Defendant that the plea agreement, the written statement, and the facts admitted in open court and on the record during the Change of Plea Hearing on August 25, 2003, are controlling.

36

(Brief in Support of Defendant's Post-Booker/Fanfan Objections to Pre-sentence Report, p. 9) This objection is overruled because it is based on an erroneous interpretation of Booker.

The final objection to consider, which we deem the least significant, is to paragraph 36, in which the Probation Officer merely recites the charges alleged in counts 1 and 6 of the second superseding indictment. Morgret's objection is that he "has not admitted to all seven of the substantive offenses as set forth in this paragraph." (Id., p. 7) The Probation Officer's description of the offenses in the indictment is not tantamount to an assertion that Morgret has admitted to all of the conduct within the scope of that description. The Probation Officer's description is accurate and its inclusion in the pre-sentence report does not in any way incriminate Morgret. We will overrule his objection to that paragraph.

IV. Conclusions of Law.

1. The government is required to prove the material facts used to determine Morgret's advisory sentencing guidelines by a preponderance of the evidence.
2. The United States Supreme Court's holdings in United States v. Booker, ___ U.S. ___, 125 S. Ct. 738 (2005), did not affect our authority to make findings of fact, based on a preponderance of the evidence, to determine the defendant's advisory guideline imprisonment range.

3.  The Probation Officer properly concluded that a two-level upward adjustment applies pursuant to United States Sentencing Guideline §§ 2D1.1(b)(1) and 3D1.2(c) because a firearm was possessed in connection with the offense.

4.  The Probation Officer properly concluded that a two-level upward adjustment applies pursuant to U.S.S.G. §§ 3C1.1 and 3D1.2(c) for obstruction of justice.

5.  The Probation Officer properly concluded that Morgret is not entitled to any downward adjustment for acceptance of responsibility.

An appropriate order will be entered.


                              s/Malcolm Muir
                              MUIR, U.S. District Judge

DATE: November 22, 2005


MM:ga

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      No. 4:CR-02-085-02
                                               :
         vs.                                :
                                               :
MICHAEL ALLEN MORGRET          :      (Judge Muir)

ORDER

November 22, 2005

1.   Morgret's oral motion to apply the "beyond a reasonable
     doubt" evidentiary standard to the objections to his
     pre-sentence report is denied.

2.   All of Morgret's objections, except that to paragraph
     65, are overruled.

3.   No ruling on Morgret's objection to paragraph 65 is
     necessary because a ruling on that objection will have
     no bearing on Morgret's sentence.

4.   Morgret shall, within 20 days after the date of this
     order, file a brief addressing the sentencing factors
     set forth in 18 U.S.C. § 3553(a).

5.   All subsequent briefing on the sentencing factors shall
     be in accordance with this court's local rules.


                              s/Malcolm Muir
                              MUIR, U.S. District Judge


MM:ga